State Number 25-NTT, Grafton & Upton Railroad Company Petitioner vs. Surface Transportation Board and United States of America. Mr. Myers for the petitioner, Mr. Light for the respondent, Mr. Gremmel for the interpreter. Good morning, Mr. Myers. You may proceed when you're ready. Good morning, Your Honors, and may it please the Court, my name is David Myers, appearing for Petitioner, Grafton & Upton Railroad Company. I've reserved three minutes for a bow. Grafton comes before this Court seeking an order vacating the December 2024 decision of the Surface Transportation Board, in which the Board affirmatively found that ICTA, Interstate Commerce Commission Termination Act, I'll call it ICTA, did not preempt the Town of Hopedale's effort to invoke a Massachusetts regime of land use regulation to block Grafton's planned expansion of its railroad facilities. Grafton submits that the order is contrary to law and that this case is straightforward. Each of the elements of ICTA preemption under 49 U.S.C. 10501A2 is satisfied here. First, it is undisputed that Grafton is a rail carrier. Second, it is also undisputed that the activity Grafton seeks to undertake is rail transportation, as defined in the statute. It is the expansion of Grafton's facilities to permit increased rail traffic, as Congress intended. Third, the Town of Hopedale seeks to use state land use law to regulate that rail transportation. Regulation means control, and taking property away to prevent its rail use is the most extreme type of control. You say taking property away. I'm going to let you finish your four points. But that is the issue in dispute, whether the property, in fact, belonged to Grafton when there was a state property law requirement that, given the tax benefit applicable to this land as forest use, the Town was entitled to a right of first refusal and sought to exercise it in a timely manner. With respect, Your Honor, there's no dispute about who owns this land. This land has always been owned, at least back in time for many years prior to this dispute arising, by the 140 Trust. The 140 Trust is still the owner of this land. So the question here is whether the state and the Town of Hopedale, working together, using this Massachusetts land use framework, which basically designs or expresses a state policy to preserve forest land as forest land and not allow for certain commercial uses, as well as residential uses, whether that law, which has a remedy of a right of first refusal associated with it, whether that law and the Town of Hopedale's decision to regulate the use of this land to keep it forest can limit what the 140 Trust can do with its land. We submit, we have no quarrel with the 140 Trust being told that it can't develop a shopping center on this land. That's legitimate land use regulation by the Commonwealth of Massachusetts and the Town of Hopedale saying you can't have a railroad facility on this land. That's where ICTA preemption kicks in. And I submit that all of the cases that we have cited express this principle that the state is not allowed to decide to call its regulation a property regulation and thereby escape ICTA preemption. We have the imminent domain cases. That's a regime of state law that decides that under certain conditions, the state can assert a property right, i.e. ownership of the land and take it away from a private owner. You are going through your four factors, the rail carrier, the activity relates to rail transportation, then the town seeks to use state land use law to take the land from the rail carrier. And then what's your fourth? Well, it's really there are three. And the third is to regulate. The state regime and the government here, the Town of Hopedale and the state working together, are seeking to regulate rail transportation on this property by prohibiting it. And prohibiting or taking property or preventing property from being used for rail transportation, a complete bar, isn't just an extra cost associated with the rail transportation. It's a prohibition. And that's what the courts have said is the most extreme form of regulation. So those three elements we submit are satisfied. Again, there's no dispute about the fact that this was 140 Trust's land. 140 Trust had an arm's length agreement with a railroad for Grafton to build a transload facility on the property. No question at all that the transload facility is rail transportation. Undisputed in this case. So the only question is whether the board just missed the issue when it decided that there was no preemption. Because it was somehow confused into thinking that this was a question of property ownership rather than a regulation. But questions of property ownership, as I said, within the eminent domain setting, also in the setting where adverse possession claims are being adjudicated in state court. But we have cases after cases finding that private landowners, adjacent landowners, who may have an absolutely ironclad state adverse possession claim to land that's in the right of not being used for the railroad right now, nonetheless, have an absolute prohibition against asserting those rights against a railroad. Again, that's a property dispute, a resolution of a property dispute in state court just can't be used to constrain the railroad's activity. If a railroad owns a piece of empty land and then it sells the land to to John Doe, and the year after the sale is complete, the railroad says, I would like to build a railroad right through that land. They would not be able to do that, correct? Well, so we certainly, I don't believe that that hypothetical is presenting a scenario that is this case. My answer would be, in a situation where the railroad conveys title to a third party voluntarily, without regulatory compulsion or regulatory incentivization, right, this is a not, it's not pursuant to a regime of land use. It's just an arm's length transaction. We want to make money selling our real estate. We're selling it to a third party. And then the railroad regrets that decision. I think that that would present a very different scenario where the railroad would have to come back into the state processes for eminent domain in order to obtain a right to build across that property. I think it's a really simple answer. I think the answer is, it's, no, it's, I mean, well, so there may be some some eminent domain avenues they can pursue, but the point is, if the property belongs to John Doe, yes, the railroad can't just up and tomorrow. No, that's absolutely right. We don't contest that proposition. Absolutely. It's a different hypothetical. Imagine the railroad owns the land, it's empty, and it leases the land to John Doe and the lease says, you can use this land and if we ever do not extend your lease, you have a right to buy the land from us and its market value. Okay. Years pass and then the railroad says, you know what, we've decided we want to build a railroad here, we are not going to extend your lease. Can they build a railroad there? I think they could, yes. Even if he, even if John Doe was willing to buy it at market value? I think they could because I think, I mean, again, I don't, I don't believe that's this case for reason of the source of the property rights in this case or the alleged property rights in this case, which is coming out of a land use regulatory scheme. It was the state deciding we want to preserve this forest land and not let things like railroads here. My question is, your question, in response to your question, I think the answer is, again, if the railroad had voluntarily entered into this contractual undertaking, and I think it does matter somewhat to that hypothetical, or to the answer to that easement or whatever it's being granted, the rights that are being granted are ones that are compatible with rail use or incompatible with rail use. If this, if this is an active rail line, for example, and let's say it's incompatible, then if it's incompatible, then I think there's a very good argument that that might well be a preempted. For one thing, I don't think it's very good for landowners, including railroad landowners, because you've now said, you know, you're not going to be able to really enter into a gains-for-trade contract with John Doe to lease out your land to John Doe, because whatever you promised John Doe is going to be legally, poof, go up in smoke anytime the railroad wants to step in. So there's a case that I think is close to, perhaps close to your hypothetical. It's the In that case, Union Pacific had entered into, it may have been a lease, of part of its right-of-way where the Chicago Transit Authority ran, I believe, tracks across part of Union Pacific's right-of-way. And then Chicago wanted to come and condemn the property. Okay. So it was no longer just a leasehold right or an easement. It was, they wanted to take and condemn that segment of land. And the landowner didn't enter into an agreement allowing Chicago to conduct the land. Union Pacific, well, I don't know the facts long enough to be certain, but the outcome of the case was that they're converting an existing lease right into an ownership with a change in circumstances that was regulation of transportation. And so that was found preemptive. But it wasn't a consensual conversion between, right? So, I'm not... You can have any case, either board or, you know, federal court, that says when the railroad has a consensual, quote-unquote, contract with another party, and the other party is entitled under that contract to the land, or at least to stop in the railroad building the land, that the federal statute preempts the contract. No, I don't, Your Honor. And again, that is not this case. In this case, Grafton and Upton did not enter into any contract with the town of Hopedale regarding the development of this land. Well, with the 140 Trust, it did engage in, whether you want to call it a contract or not, a quid pro quo bargain. They got really low tax rates in exchange for using the land as forest until they, until at some point, if they want to convert it, they agree not to convert it without allowing the city to buy it first. Or if they want to sell it for conversion. As to 140 Trust, yes, they signed up for this tax break at some point back in time before there was any prospect of real use of this property. They obtained some tax breaks. Just as a factual matter, it's in our reply brief, those tax breaks had been rolled back by the town. The town sent a demand for payment of all of those tax breaks, and they've been paid, and the tax lien's been released, just as a matter of fact. So they did get it. They did not end up getting it back. I'm sorry to interrupt, but did they take the tax breaks back after you cut down all the trees? In 2022. Is that after you cut down the trees? I don't know precisely when in the sequence of events that occurred. So with respect to that question of whether 140 Trust's decision voluntarily to partake of this benefit converts this case into something other than a regulation, the government makes this argument in its brief at pages 33 to 34 about this voluntary commitment. With respect, number one, that issue is not in the decision. That rationale is not in the decision rendered by the board, which I think disqualifies it as a ground for upholding the decision. But on the merits, the government's argument is telling here. What the government says and the cases it relies upon in the preemption field are all situations where a railroad's voluntary commitment is evidence that the burden on transportation associated with the railroad making that commitment will not be unreasonable. So it's cases like in the PCS phosphate case, where the railroad, in order to get a right of way across a mine's property, agrees that when the mine needs to mine under their tracks, the railroad will pay for the relocation. The railroad has decided that the burden of doing that by making a voluntary commitment is not unreasonable. Similarly, the Township of Woodbridge case, where the railroad agrees with the town fathers about when it will idle locomotives or for how long, what hours they'll idle the locomotives. Again, that's not preempted only because it's a voluntary commitment by the railroad, which is deemed evidence that it's not an unreasonable interference with the railroad. The tax break thing was a voluntary commitment by 140 Trusts. It was, but it wasn't. All the cases stand for the proposition that it's only because the railroad is consenting to a certain- I don't understand. The railroad now controls 140 Trusts, correct? The railroad does control 140 Trusts. Why shouldn't the railroad be responsible for the agreements and obligations of 140 Trusts? Well, I think with respect, I think the answer is found in DICTA, right? Because this was a regulation that is limiting rail development, restricting rail development. It's targeting rail development. It's preserving forests, and it's doing it. If you have a town that has residential zoning, and there's a commercial center that can have more dense zoning, and can have parking, and can have shops, but the rest of it is, let's say, 10-acre zoning. And the railroad wants to come through, and it just buys land. And if the land is- I mean, I just don't know the general ICTA law. They just want to buy up a bunch of houses and run a railroad right through the center of town. They can do that? Absolutely not. No? I'm sorry. I got confused about who you're asking. The town cannot prevent the railroad using its zoning laws from building on any property that is suitable for building a railroad. And that's very clear in the case law. They can just build right through the historic center of town, no problem. Okay. So the exceptions from ICTA are health and safety regulation, basically.  Land use regulation, zoning restrictions. You know, you may have the tightest zoning regarding no commercial use, no industrial use. But railroad use, when a state or other says these zoning laws create a restriction on how a railroad can use its property, the railroad wants to build- Wait. You added the state in there. When the state says it's preemptive, you can't restrict the railroad unilaterally under your theory. It's going back to the structure of ICTA, right? The structure of ICTA has expressed preemption of all state law. And of course, it applies as well to municipal ordinances and everything else underneath the state that regulates rail transportation. And all of the case law is very clear that zoning, condemnation, adverse possession, anything, no matter whose rights they are, property owners, private property owners, or the town fathers, or anyone else who wants to regulate railroad transportation, cannot do so because of that expressed preemption clause. And so there are cases- It's not the town or the state taking land or asserting a- on behalf of the town or the state. It's these parties saying, you know, the trust said, it's worth it to us to give this right of first refusal and to give up the flexibility of how land is used for this fixed period of 10 years, plus to agree to right of first refusal by the town because we're getting a big tax break. So one of the things that the tax break, you know, that they give in consideration for the tax break that they got was right of first refusal. But chapter 61 says no sale of the land shall be consummated until the option period has expired or the notice of non-exercise has been recorded by the register of deeds. So the town and the state board has said that there's no valid sale unless and until the right of first refusal is given. The right of first refusal was accepted when the town had an opportunity to accept it. How do you say this? Ownership of the property is not endowed. The 140 trusts own this property, right? And the question in state court, I absolutely agree that the question from the perspective of the state court is whether the 140 trust can keep this property or whether the town of Hopedale is allowed by state law to take it away, right? Buy it. Yes, to force a sale. Yes, absolutely. 140 trust was selling and, yeah, or they could force a sale if they were going to keep it and convert it. Yeah. Grafton has not purchased this property, right? The 140 trust, it stays in the 140 trust. Because Grafton purchased the 140 trust. Grafton acquired the beneficial interest in 140 trust, yes. I think if you step back, you know, multiple layers in this case where when you step back and look at what's going on here, right, it's land use regulation. So you start with the proposition that chapter 61 itself is about the state attempting to erect a regime that favors forest preservation, laudable objective, over rail development. No, it favors forest preservation, unlike the Dakota, Minnesota, and Eastern Railroad, where South Dakota was making it harder for railroads in particular. Here, there's no disfavor. Entirely fair, right? I'm not contending that chapter 61 was targeting railroads. Indeed, that's why we proceeded with this claim as an as-applied preemption claim. Chapter 61, when applied to the shopping center, we have no if to claim. When applied to railroad development, it is regulating railroads. It is preventing railroad development. So another hypothetical, this would be helpful, because I can kind of try to think through the case. Imagine I have a piece of land, my house is on it, I've lived there my whole life. And a railroad comes and says, I would like to buy your land for, let's say, it's in a very, valuable real estate area. I'd like to buy your land for a million dollars. And I say, oh, man, you know, I could use a million, you know, it's really worth a million dollars to me to know that my childhood home will not be torn down. It's very sentimental to me. So I say, I don't really need this land. I'll sell you the land for a dollar, but there's going to be a covenant on it. And the deal is, I'll sell it to you for a dollar if you promise you won't tear down my childhood home. And you're like, okay, yeah, sure, it's a deal. And then you get title, I get the dollar, I think I have a million-dollar promise from you that's worth a million dollars to me that you won't tear down. And then the next day, like, I'm a railroad, because of preemption, I can build a railroad here, and the deal I made with you is preempted. That doesn't sound like it's right. No, I don't think that would be preempted. Okay. Why wouldn't it be preempted? I think that's the kind of case, like the voluntary commitment cases that the government cites, where the railroad is making a voluntary undertaking, a voluntary commitment, entering a contract, or some other form of obligation. And the fact that the railroad is willing to make that commitment is an indication that keeping the home intact, not tearing it down, is not incompatible, not an unreasonable burden on its rail transportation. Okay. And here, the 140 Trust made that commitment. There was no railroad in prospect when this commitment was made. Right. The 140 Trust made the commitment to the city. And then when the railroad purchased 140 Trust's beneficial interest, in other words, when the railroad gained control of 140 Trust, they also became responsible for 140 Trust's commitments. That's what they bought. They bought the land and the commitments. They acquired control of the Trust. Yes. It's a general matter when you say that when someone buys control of the Trust, they become responsible for the Trust's agreements? I don't have any quarrel with that. But then why here, when the railroad gained control of the Trust, did the railroad not become responsible for the Trust's agreements? Because ICTA preemption does not allow predecessors to railroads to enter into regulatory arrangements, to accept regulatory arrangements that prohibit rail transportation development. And if Grafton had purchased this property, and Grafton had said to the town, look, we are willing to keep this tree line over here. We'll do these other things over here that, you know, serve the interest that you have in, you know, whatever they are, noise or, you know, water cleanliness or what have you. And Grafton had entered into those commitments with the town. And the town was seeking... Does the town have to get any commitments from railroads under your view of the breadth of preemption that it preempts any land use contractual covenants that would in practice impede or disable railroads? I suppose the answer to that question would be probably an unsatisfactory it depends. At the, you know, ICTA has been interpreted and applied in ways that allow for health and safety regulation that's not incompatible with the rail use. So, you know, there are cases like the railroad dumping railroad ties and streams, but that's not preempted. There are cases about the board, the STB, encouraging railroads to enter into commitments with respect to new projects to deal with environmental mitigation concerns by the And, you know, at the margin, you know, when there's a concern about health and safety related to the adjoining transload facility or the rail facility, there's a margin of allowable regulation and there's an encouragement from the board to reach consensual arrangements between the railroad and the community. What's your best authority for a case that says because of preemption here, a railroad does not have to be faithful to commitments that it made about how the land would be used? But your honor, I'm not sure I have a case that deals in a context where the railroad had made commitments that prohibit any real development and where do we have a preemption in one way or the other? And I think there's tell me if I'm wrong. I think there's not a case where the railroad has bought land that came encumbered with voluntary commitments. Well, you know, and the railroad didn't have to be faithful to the voluntary commitments that came with the land at purchase. With respect, I think that that's somewhat in the eye of the beholder of how you think of zoning restrictions, for example. Like in the zoning context, I think there are lots of situations, certainly I can imagine, where a property owner may have embraced some designation of the owner's property as residential, for example, or as, you know, zoned single family. You know, that may have been that that property owner sought that zoning designation for that part of the community. I think in that setting, there's no question that those preexisting zoning restrictions on use, which predate the acquisition by the railroad of the property, are swept away by ICTA to the extent of supporting rail transportation and expansion of the rail network. Now, we haven't in this country had, you know, since ICTA 1996, had a lot of new railroads being built through communities. So we don't have a lot of reservoir of this kind of case. Most of the cases arise in the context of transload facilities or other unloading and loading facilities, which are being expanded across the country. This is what this case is about. And there's specifically the case where one of the arguments from the town was, don't build your transload here. Go down there where it's zoned industrial. You can't build it here. That was squarely preempted without hesitation. I think the zoning analogy is your best analogy. I'll have some questions for the government about why they think this is different than a zoning case. I'm guessing that you don't have any authorities you can point me to where the zoning-like regulation was actually the product of quid pro quo exchange of benefits. I mean, I can't tell you that none of the zoning situations were not such events, but I don't have a case at hand that says that. Right. Thank you. And are there any cases where the unique suitability of a parcel of land for railroads plan development factored into the burden assessment? Frankly, Your Honor, most of the cases... It's helpful just yes or no. Well, I'm sorry. No specific case comes to mind. I think in most cases where there's a prohibition on the use, it doesn't matter whether that specific parcel is uniquely beneficial. I think in our case, if we get to the point where it's determined that we didn't have a property interest and it was not a regulation by the state or the town in order to enforce the land use restriction here, which of course we think it was, there's still this question of whether this parcel is uniquely suited. And there's record evidence in our petition that it is the only place along our rail line for this kind of facility to be built. And so there is a unique burden here I would submit. The board truncated its consideration of facts in this case and never got to the question of burden. It tends to be different if the purchaser were not the town if I have a big farm and I sell land to my cousin and I say, I want you to be farming to my farm. And if you're planning to do anything else with that land, I have a right of first refusal to purchase it back. And the cousin wants to sell it to your client. And I exercise my right of refusal to say, no, I don't want that. I want this to be my farm and I'm willing to let you be an adjacent farm. I'm not willing to let you sell to the railroad. Is that also preemptive? I'm not sure what your question meant by would my answer be different. I would say the answer to your question is that would be a question of whether the railroad isn't able to acquire from landowner the rights to build a railroad. And it's not a state regulating the existence of land use or the town deciding to enforce, we could call it the equivalent of a zoning restriction. Whether the fact that the town is a town as opposed to a private purchaser is the whole fulcrum of your argument. And you're saying that the town is... There are two parts. Yeah. Now the two fulcrum. One is that, yes, the town is choosing to exercise a right of first refusal as part of a policy judgment about regulating the land use on this property. Second, it's the entire Chapter 61 regime is where this right came from. It's not the sale of a right of first refusal to your brother or cousin, sibling who has the adjacent farm. It's not that private transaction. If it were that, then we'd just have a straightforward property law question of who owns the rights to sell the farm. And that would be in state court. And if the railroad wanted to build there or needed to build there, it would proceed presumably by eminent domain. And in an eminent domain setting, again, to your question about unique suitability, if the state has erected an eminent domain regime that makes it effectively impossible for railroads to buy the transport ticket to build the lines that they need, that may well be preempted. That's a different case. Something like Chapter 61, but it is just trying to help family farms that are where the price of real estate is pricing them out. And they say, we're going to give you like a low conservation tax rate if everyone you sell to of what used to be your open fields agrees to, you know, use it as farmland. And but it's a private, you know, I'm the farmer. I get a break on my land if I sell it, if they do farm. But it's all private parties. So it's a law that sort of invites it and gives you a better tax break. But it's all private parties that are buying and selling. I'm just trying to separate your two, your A and your B, your right of first refusal purchased by the town. And then the usage that's being enforced is one identified by the state law. I think you have that identified by state law, but the purchasers are private. Does that change your answer? The question that I have about your farming hypothetical that I think is necessary for me to give an answer is whether a landowner in that situation can decide to sell his or her land to the railroad for railroad construction. No, there's a right of first refusal. I mean, they could, but there's a right of first refusal. And if the farmer wants to buy it back, they can. So you wouldn't be able to get the land. You'd go to the farmer and the landowner. And if they both agree, you could build the railroad or would the state prevent that from happening? You go to the cousin who's bought the farm, and the railroad goes to his cousin. And the cousin says, yeah, I'll sell it to you, except my uncle has, or my cousin, you know, has a right of first refusal. And the cousin says, yeah, I want it back. Enforceable or not? I think that's a difficult hypothetical, but... Well, it's just asking, what if there were no Chapter 61? Well, with respect, Your Honor, I think it's asking if there's a Chapter 61 where the town isn't the holder of the right of first refusal. Just take it to the next step, then. There's no Chapter 61. There's no Chapter 61. I don't think there's any preemption claim barring some effort to block eminent domain acquisition or to prohibit, you know, if there were something different from Chapter 61, you know, a pro... So, for example, a prohibition on selling to commercial use or non-farming use, I think that would be preempted. You know, if it's just two private landowners deciding this is how we don't want to sell the railroad, or I'm going to give you, you know, half interest in my land, then, yeah, we have to go negotiate with those holders of the property rights, and if they don't want to sell, then we have to go to eminent domain or build some more. And here the successor or the holder of the right of first refusal is the town. It was, but there was a Chapter 61, and... I'm fairly certain there was a Chapter 61. Yes, and so let's come back to that part of that part to your question, which is, like, the town here, right, is making a decision. Even if you grant all the rest of the government's argument, the town is still making a decision to exercise the right of first refusal. And why is it doing that? It's exercising the right of first refusal to control the land use. Because of the conversion of land use, it's not just a sale. It's a sale for conversion, or it's a conversion under Chapter 61. It's the conversion of the land use that is triggering the town's interest in taking the land away from 140 Trust. That's equally true if it's a conversion to some use other than railroading. It would be. In that case, we wouldn't be here because it would have nothing to say about it. Let's talk about if you had no right of first refusal, you had no Chapter 61, you just have a town where people know each other and they're close, and somebody's land trust here is getting ready to sell its land. And so there's no encumbrance or anything. And there are two offers, one from the railroad and one from the town. And the town says, let's make this into a nature park with a trail and playground. And the town says, the seller, the trust is great. That sounds really nice. I'm going to sell to the town. Because I like the idea of having a nature park and a playground. The railroad's position there would be can't do that. I think, I think my position on that would be, you know, if it's just occurred, just as a property acquisition. And the question was, landowner sell to railroad or sell to someone else. No regulatory influence on the choice, no command, no restriction on how the land can be used. So for example, if, you know, if there were a restriction on the landowner's ability to do something, so had to sell to a town, if the railroad wanted to come, that would be a different case. But I think you still would have to ask the question, in that case, whether what the town was about in that setting was about restricting the rail development, taking it out of the path of the railroad. And that might well be regulation in that case. I don't look into different facts from this case. Can I get sort of a factual question answered? Chapter 61 is triggered when sale happens. Chapter 61 is also triggered when a conversion without sale happens. Which of the two triggered Chapter 61 here? Well, I believe it's the position of the town that both were triggered. What's your position? Oh, you think Chapter 61 is preempted. But if there had been no ICTA, there had been no preemption, when was Chapter 61 triggered? I'm reluctant to speak for Grafton on that question, which is in dispute and being litigated in state court in Massachusetts. And I can, I just don't, I don't know what position Grafton would take on that. Okay, and you don't know what position they've taken in state court on that? I believe they've taken the position that it wasn't triggered by a sale, by a sale. That it was triggered by a sale? It was not triggered by a sale because 140 Trust continues to hold the land. Okay, so if it was triggered at all, it wouldn't have been triggered by the conversion. I believe that's their position. Okay, thank you. Thank you, Garth. We'll hear from Mr. Light from the board. May it please the court, my name is Eric Light, attorney with the Surface Transportation Board here on behalf of the board in the United States. One of the questions that was asked was whether or not railroads can be held to the voluntary commitments of their predecessors and interests. And there is such a case. I just want to point that out at the beginning. It's PCS phosphate fourth circuit case. In that case, a railroad had agreed to fund the rerouting of a railroads operations and the railroad's successor was bound by that commitment. The exemption did not bar that agreement from being enforced. I may have that somewhere, but do you happen to have the reporter number on that? It is 559F3212. Thank you. Now, in seeking reopening in this case, Grafton assured the board that the preemption issue here was simple and straightforward. And consistent with that description, Grafton presented the board with two very simple arguments in favor of preemption, both focused on the facts of this particular case. The first argument was that it was a preclusion argument based on the idea that there's this analogy between eminent domain and chapter 61. The second argument was the unreasonable burden argument based on the town's alleged reneging on the settlement agreement. Here, the board properly rejected both of these arguments. Turning first to the preclusion argument, the argument was that the board's preemption conclusion in the eminent domain decision precluded a contrary finding in the chapter 61 decision. And the reason- Interrupt, because the brief was extremely well done, and I think what you're about to say is in your brief. To the extent that there's any obstacle to me getting to where you want the court to go, it's this analogy between what's going on here and a zoning regulation. You could probably tell from my questions, if I think of this as the product of a contractual agreement between 140 Trust and the city, then I think it's a pretty tough road for the railroad here. But the reason it's a tough road is the reason that I'm getting a little hung up on the zoning thing. So I think it would otherwise be a tough road, because it's like in law school. You learn about the property on the bundle of sticks. And it seems pretty clear that when the railroad gained control of 140 Trust, they didn't gain control of all the bundle of sticks that you could imagine gaining control of when you gain control of the property. And in particular, they didn't gain control of this one bundle of sticks, this one stick that would say, you can do whatever you want with this property. Rather, what came to the deal is, you have to let the city buy the land if you want to do something other than a forest with your property. So the railroad never owned the right to do this. The right's not being taken away from the railroad. Preemption doesn't have anything to say about, you know, how a railroad can get more property than it's already owned. So that all seems good. But that argument, I think, works sort of with zoning as well. And we've got all these cases that say that even if you purchase a property that's zoned for, say, residential use, which means you didn't get the stick that would allow you to use your property for industrial use, even if you bought that bundle of sticks without the stick for industrial use, because of preemption, once you've got those other sticks, the zoning regulation goes out the window. And voila, you now have the preemption cabinet stick that allows you to use your property for industrial use, use it to build a railroad. So why isn't that this case? The difference, Your Honor, is that zoning is, it's regulatory. It's top-down imposition of government policy, whereas Chapter 61 is a voluntary tax program. I mean, that's how the Massachusetts Appeals Court described it, says it's a voluntary tax program involving lower taxes in exchange for continued forest use and a right of first refusal. Grafton itself, in its brief, acknowledges that Chapter 61 is an opt-in. That's page 18 of the reply brief, that landowners under Chapter 61, landowners opt into the program to get lower rates. And that, in fact, in this particular case, the 140 Trust voluntarily designated this property as forest land. In my hypothetical, the purchaser of the land that comes with the residential zoning requirement, it has voluntarily agreed to the residential zoning requirement. They bought the land accepting that there's a residential zoning requirement. It may well have been that the land was, you know, worth less than it otherwise would have been, and they paid less. So, in other words, they were, in terms of the money that they didn't have to pay to get the land, they were, in effect, paid to accept the incumbent residential zoning requirement. I don't think that analogy or that argument were shown. Again, zoning was the restriction in zoning was imposed by the government. And it was perhaps acquiesced in by the homeowner because they had no alternative. They could have not bought the home. Well, that's true. But still, it's a government-imposed policy. I think there's no question about that. Whereas, in the Chapter 61 context, it's something that the landowner voluntarily agrees to. And what's the best case for that distinction in the dicta preemption context? Specifically in terms of zoning? Or just, I guess, specifically in terms of... Voluntary commitment? Yeah. Well, PCS phosphate, the Board's Town of Woodbridge case. Yeah. So, I mean, I think that's the difference. I don't think in zoning, you can get away from the fact that it really is a top-down government imposition of a policy. I think it would be an easier... You'd be on even stronger ground about Chapter 61 if the rule about zoning was it doesn't preempt zoning rules that pre-exist the railroad's property. But it does preempt zoning rules that are imposed on the land after ICTA has purchased the property. Because in that second scenario, it really does seem like there's nothing voluntary about what the railroad is doing. They're not agreeing to a zoning rule that is being imposed on property they already own. But in the first scenario, they're sort of agreeing to the zoning rule because, you know, if they could have bought land anywhere in the world, they chose to buy this land with this zoning limit on it. And they preempted it. I would say there wasn't an agreement between the land, the homeowner in that case, and the authority that imposed the zoning restriction. There's no agreement. It's just like, okay, well, you imposed it. It could have been. I mean, this happens all the time, I think. You go to the city, you're like, all right, I need a permit. And the city's like, we'll give you your permit, but you have to accept this new change in the regulatory regime. Again, in that case, I think there is a backing of government imposition in that sort of a situation where there is no imposition in Chapter 61, as I understand it. And as the Massachusetts Appeals Court explained it, it's just a purely voluntary program. I mean, you could imagine it being viewed as coercive, because what Massachusetts is saying is, we will raise your tax rates to whatever they would normally be, unless you make your land a forest, in which case we'll give you, it just depends on where you set the baseline. At what point did the town's right to purchase the land get triggered? Was it from the sale, or was it from conversion without a sale? I think it's possibly both. That's an issue of state law that the board didn't really take a position on. It's probably a better question for the town. Okay, awesome. Yeah. So, are there any questions about the eminent domain analogy kind of thing? I'm going to turn to the second preemption argument, which was equally simple as its first, and we believe equally as without merit. Grafton argued that the town's pursuit of its Chapter 61 right of first refusal was an unreasonable burden on rail transportation, because Grafton had relied on the settlement agreement to make significant investments in the property, and then the town reneged on the settlement agreement. The board properly rejected this argument. First of all, as the board found, there was no reneging on the settlement agreement. It wasn't the town that backed out. It was the town's citizens, which independently challenged the settlement agreement. That is undisputed in the record. But they act as the town. These were 10 individual citizens who challenged the settlement agreement. But they were able to assert their right as members of the town? No, they were asserting their rights individually. But then the town has to be ready to exercise that right of first refusal if they're defending it. I'm sorry, maybe I missed the beginning of your comments. I think the town changed its mind later to say, okay, we're now going to exercise a right of first refusal. But it wasn't the town which invalidated the right of first refusal. That was by the citizens through an independent action. They didn't invalidate the right of first refusal. I'm not the right of first refusal. I'm sorry, the settlement agreement. They invalidated the settlement agreement for failure to abide by the Chapter 61 right of first refusal. No, as I understand, it was because the town had been given certain authority to abide. They ceded the authority by chopping up the parsley. They tried to buy less. They settled for less than the entire amount. They invalidated, the town members invalidated the settlement saying that basically that the people who negotiated the settlement on behalf of the town acted ultra vires if they're at the- Yes, that's the basis on which it was invalidated. So there's no question that it wasn't the town back in a way. Moreover, the board reasonably questioned how much reliance Grafton actually placed on the settlement agreement given that it started these investment activities, clear-cutting the forest even before there was a settlement agreement. That's undisputed in the record. Moreover, the board questioned whether any reliance by the town, I mean by Grafton, was reasonable to the extent it did rely on the settlement agreement, whether any of that reliance was reasonable given the fact that citizens challenged the settlement agreement almost immediately after it was signed. Going back to the other issue, if the state court were to determine that the railroad had lawfully obtained the property at issue, I mean let's say the town didn't act promptly, its right of first refusal expired, then Chapter 61 would not be at issue, would be satisfied, right? So if I understand the question, if there was a state court determination that- That the purchase by the railroad was valid, then Chapter 61 falls out of the picture. I mean presumably it's reflected in whatever the state court does, the treatment of Chapter 61. I mean, I suppose it's possible that the state court could say, yes, the railroad actually bought the property, but it's still subject to the right of first refusal. Right, which is, in effect, since they've now become a controlling- Yes. In the trust, then it would still be subject to that right of first refusal. All right. And now we'll hear from Mr. Graml for Hopedale. Good morning, Your Honors. I'm Sean Graml, and I represent the intervener town of Hopedale. I'd like to start by answering Your Honor's question about when the right of first refusal was triggered. So it was triggered not because of the sale, but because of the notice of the proposed sale on July 7th or 9th of 2020. No sale was ever legally consummated here. That's what the terms of Chapter 61, Section 8 say. For 120 days, the town had a right of first refusal to decide whether to exercise its right or not. That was a notice that who would sell to who? I'm sorry, repeat that. You said that the Chapter 61 was triggered when there was a notice of sale. And I'm asking, it was a notice of a sale from whom to whom? By the 140 Realty Trust to another Realty Trust that's indirectly controlled by the railroad or the railroad's owner. Did the railroad already own the beneficiary interest in 140 Trust before that notice?  No. So it was when the Chapter 61 was triggered, you think, when there was notice that the railroad was seeking to purchase control of the trust. So at that point, the railroad was seeking to buy the land directly from the trust. It was only later on in October that the railroad decided to buy the beneficial interest of the trust. The change of the beneficial interest triggered a second independent right of first refusal because a Realty Trust is a, I think it's unique Massachusetts creation where a Realty Trust is just a bare title holding entity in Massachusetts State Courts. We cite some cases in our brief. When the beneficial interest of a Realty Trust changes hands, that just means the sale of land happened because the only thing the trust really can do, it can make agreements, of So in July of 2020, the right of first refusal was triggered and the town had a right at that point to buy the land directly from the 140 Realty Trust. So this land should have gone from a non-railroad, the trust, to a non-railroad, the town. The railroad is saying that rail preemption preempts that non-railroad to non-railroad transaction. But I heard from Attorney Meyers. I just want to make sure I'm 100% clear, especially who knows who will write this, but if I write it, I want to make sure I have this fact exactly clear. At that moment of notice that you're describing, the railroad had no interest whatsoever in 140 Trust. Correct. Correct. And the purchase and sale agreement had to be attached to that notice of intent that was sent to the town. The railroad itself, in Section 1.1 of that purchase and sale agreement, that 220 of the joint appendix, was agreeing to buy the property subject to Chapter 61. In Section 4.7 of the purchase and sale agreement that the railroad agreed to, they agreed that if the town exercises the Chapter 61 rights, then the purchase and sale agreement would just terminate of its own accord. The railroad made those agreements, not the trust. Under Massachusetts law, if the state court resolution is in favor of, is not favorable to the railroad, can the, does the railroad have the ability to, by delegation from the state, to exercise the power of eminence on mine? So, if the town were to buy this property, could the railroad later use eminent domain? I think it's a feature of Massachusetts law that once land is held for some public interest, like a park, a nature preserve, conservation, another form of eminent domain can't come in and take it, because otherwise, the cities and towns and the MBTA could just take it from each other over and over again. That's important in understanding why this is being litigated now, rather than later. Yes, but there is rail eminent domain in Massachusetts, and the railroad tried to obtain this property under Chapter 160, Section 83. They abandoned that in the spring of 2020, because it was taking too long. So, instead, they tried to take this property right from the town of Hopedale. That's whose right is being taken here, is the town. They tried to take this right away from the town of Hopedale by by depriving the town of its Chapter 61 rights. And when there was notice of the sale from the 140 Trust to the trust that the railroad controlled, the Chapter 61 was triggered, as we discussed, and the town timely asserted its preference to buy the land? Yes, yes. So, under the statute, the town was required to tell the railroad that some of the notice was defective for reasons that aren't relevant here. And then the town held a town meeting, which appropriates the money in town and authorized the Select Board to buy this property. The Select Board then voted unanimously to exercise the right of first refusal, and then recorded the right of first refusal in the Registry of Deeds. So, the town checked all of its statutory boxes. If there are no other questions, I'm happy to rest on our brief. Thank you. There were two other rights of first refusal. I'm sorry, that's sort of, it's all like belted suspenders, because there was conversion of the forest property. There was, there were, tell me what, I think there was three in my notes anyway. There are three independent occasions that gave rise to the right of first refusal. There's the notice of intent in July of 2020, which was the notice of the proposed sale. And then in October of 2020, when the railroad bought the beneficial interest of the trust, which is the equivalent under Mass. Law of just buying the land, well, they bought the land to convert it. So, that also triggers the statute. And then when they started to convert the land from non-forest use by clearcutting the trees in October of 2020, a few weeks later, that also triggered the right of first refusal. And did they give notice when they bought the beneficial interest in the trust?  But they should have. They should have. They said that the trust said they would have, but they didn't. And then the day after, the then president of the railroad wrote a letter to the town. And I don't believe they gave notice of the clearcutting either. Okay, that was my other question. Okay, thank you. Thank you. Way overstayed my welcome, if I may have a few minutes. I'd like to start where the government started with the PCS phosphate case. He described it as a case where there was a voluntary commitment made by a predecessor to the railroad. It was a predecessor railroad. The railroad in the case was the Norfolk Southern Railway Company. The predecessor was old Norfolk Southern prior to a corporate transaction that restructured the railroad. And in that case, and I think this is the most important principle coming out of the voluntary commitment law that the government relies upon here. This is at 559 F3rd at 224. As the STB has recognized, voluntary agreements must be seen as reflecting the carrier's own determination and admission that the agreements would not unreasonably interfere with interstate commerce. So when a railroad makes a voluntary commitment, it is as a railroad making a judgment about whether that commitment is or is not consistent with its operation of part of the rail transportation network of the United States. In this case, the predecessor, 140 Trust, was not capable of making any such judgment or determination. And so it's not the voluntary commitment in this case, I would argue, is just not qualifying for purposes of this exception to preemption. Now I'm going to go all the way around all over again. But the argument we discussed is the railroad purchased that voluntary commitment when it purchased the land. So I guess to help me think through whether that is the case or is not the case, what if for the past 100 years, the railroad had just owned the land, period. And at some point, they decide, we're going to make this forest and give it tax breaks. And then some point later after that, they decide, okay, we want to build a railroad on this.  So could they build a railroad on it or would the city have been right at first? So I think if this were the railroad proceeding down that path, one of the features of Chapter 61 that's been overlooked is the ability to opt back out of Chapter 61. I think when you opt back out, then the city has a chance to purchase if you then convert. I think I would submit that to the extent that the opt-out is prohibited because this has become regulated, essentially zoned as forest land by virtue of some commitment made years ago. That's the kind of burden on interstate commerce and rail transportation. And I think it's a principled answer. It's a consistent answer. This case would be exactly the same outcome if 140 Trust had never existed and that for the past 100 years, the railroad had owned the land and had done with the land everything that 140 Trust did. I think it would be a harder judgment to get to that conclusion in that scenario because you'd have to proceed through the burden on, you know, the degree to which there was a burden and whether, you know, whether the railroad's judgment about putting the land into forest preserve or whatever it was, was, you know, was a reflection of some judgment that it didn't need this property. And so you have this debate over whether this property was needed by the railroad. Here, right, 140 Trust couldn't make that determination. The railroad did make that determination that this property was uniquely suitable along its right-of-way. And so, but it's blocked. It's blocked by a land-use regulation. Mr. Grimm will say that in the agreement of purchase, that the railroad actually agreed that it purchased this land subject to the town's right of first refusal. And in that case, then your argument about, you know, eyes wide open, railroad makes a judgment, surely it's not our business under ICTA to rescue the railroad from its erroneous judgment about what's in the railroad's interest. So I'll say the following about the agreement that he referenced. It's not part of the record. I haven't seen it. I don't know what the context is of that provision. The, if there is a provision, I'm fairly confident that the railroad would have acquired its interest in this property, reached the agreement, you know, initially with 140 Trust to buy the property and then acquire the 140 Trust, understanding that efforts to prevent a railroad from building a transload facility through land-use regulation would be preempted. My client had a very similar episode with another town in this part of Massachusetts along its line where a different form of land use was in fact held preempted. So I think there may be a chicken and egg problem in relying upon subject to Chapter 61. Chapter 61 certainly was out there. Our position that the effort to enforce it is preempted. Well, I think I'm reading from what he referenced, which is a JA-220 purchase sale agreement. And it's the railroads, Huffingburgh Realty Trust, is that the one? And then it talks about subject to forest land tax lien and more particularly described with all privileges, rights, easements, and appurtenances belonging to such land, all rights, title, and interests of seller, other right of way appurtenances, interests, blah, blah, blah. I apologize, Your Honor. Are you reading from 220? I'm just trying to find it. On paragraph 1.1. I mean, this is just referenced. And even on page 226, notice to the town pursuant to Chapter 61, buyer shall file with the town of Hopetill notice required if properties intend to be conveyed. In the event the town exercises the right of first refusal, this agreement shall terminate. So basically contemplating that the railroad won't buy it if the town exercises the right of first refusal. Let's look. I mean, I was looking at this for the first time, but. Yeah, I do see that, Your Honor. I don't think that this is an eyes wide open, you know, example of the railroad choosing to acquire property that it couldn't use for rail transportation. It wasn't acknowledging. It could be in a beef with the seller, not with the town under this provision. My understanding is that this disagreement is the agreement to purchase the land that was described as the first. The source of the first notice to the town and where the status quo rests today is that this transaction was not consummated. And so which notice do you think we're operating under? I don't know, Your Honor. I do know that the town continues to assert these three different bases for there being a trigger under Chapter 61. And again, it may be a suspended strategy on their part. I don't know which is the one that the state if the state decides to enforce the Chapter 61 rights. I don't know which leg of that stool the state will rely upon. From my perspective, our perspective, it doesn't matter because in all cases, it's enforcing a judgment by the state and by the town to preserve this as forest land, notwithstanding the fact that we have a rail development project that's being blocked. What's the status of the state court litigation? I don't know precisely. I mean, I know it's pending and the town is continuing to assert the right to force the sale to it of the property. What court is it in? I believe it's at least in the land court. There have been several state adjudicative bodies that have been involved. I believe the land court at least. A couple of times your answers, I think they've been fine. They've been candid. But it had been when we have questions that are potentially relevant to deciding the issue, your answers sometimes are that you don't know. I think it's not that you don't know. I think it's that the state court probably has not clarified state laws all the way. Maybe we should wait for the state court to issue its decision and then decide whether whatever the state court's understanding of the state property law here is in conflict with ICTA. Well, I think Routzen's position would be that deferring to the state to determine what is legally acceptable in the way of this property, which the landowner wanted to sell to us, the landowner wanted to give graphical control of the property and did so. Subject to... That is in some ways the whole case. I understand that. Did you purchase all the sticks or did you purchase some of the sticks? But your honor, no matter... The reason why if you use the bundle of sticks framework, right, if it's true that a state court decides that not all of the sticks are in the bundle that 140 Trust is allowed to wield or to exercise or to operate under, the reason why that stick is absent is because of a state land use program and a judgment made for whatever reasons it was made sometime in the past to get some tax breaks that have now been repaid by a non-railroad that is burdening interstate commerce and interfering with rail transportation in an absolute way. This isn't just some small thing that can't be a translocal facility built on this property because of these restrictions. So I think the first answer to that question is it kind of doesn't matter how it turns out in state court. What if the state court finds that the sale of the 140 Trust was never valid as a matter of state law? I'm sorry, the transfer of control. Yeah, the acquisition of the beneficial interest or whatever you called it in the 140 Trust. If that wasn't valid. Well, we know that 140... I don't know what would happen under state law with trustees of 140 Trust. We don't either. You don't know because you can't know. It's not that you are prepared for it. It's just that you can't know. If it's... I can't know precisely how the state court navigates whatever intricacies there may be about how to apply Chapter 61. Our point would be the town is trying to apply Chapter 61 to prevent this property from being used for rail transportation. That ought to have been found preempted by the Service Transportation Board. Now, if there's some other outcome in state court where, you know, some other path gets taken, well, as long as it's not the town enforcing a right to prevent the property from being used for rail transportation, there may be another issue. It doesn't matter. The point is that effort ought to have been preempted. I think if, you know, that would advance our position. All right. Thank you. Thank you.
judges: Pillard; Walker; Ginsburg